Good morning. We will hear argument in Sandlands v. Horry County. May it please the Court, I'm Vincent Shaheen from the South Carolina Bar. The issues presented before you today are several. One, can Horry County and the Solid Waste Authority restrict an article of commerce, in this case a waste, specifically inside its political boundaries so that it can't leave and go to North Carolina or any other place? Secondly, is there evidence in the record to show that Horry County or the Solid Waste Authority discriminated, treated private entities differently? And if either of these are true, then the Court should find that they are facially discriminatory and there's a rigorous standard that must be applied. Finally, if the Court finds that either in its implementation or in the way it's written, that the ordinance is not facially discriminatory, then the Court should apply the Pike balancing test and the Court should review the trial court, which failed to meaningfully apply any balancing in the summary judgment motion that was granted. My clients are expressed disposal. How does the revenue flow to the county under this ordinance? Your Honor, the revenue flows in payments to the Solid Waste Authority, payments, tipping fees that come into the dump, and then transfers are made occasionally based on whatever basis, no standard basis. Who's paying the Solid Waste Authority? The waste haulers and the people who are dumping trash. So it's private carriers? Yes, sir. Or if a consumer or an individual wanted to take his trash to the dump, they could pay something. In this case, Your Honor, it's a very broad ordinance compared to what is written about, for example, in United Haulers, which is briefed or carbone. Perhaps then you could specify those areas of difference. They seem remarkably similar in many respects. Thank you, Your Honor. For example, in 2.1.1 of the ordinance, it specifically states that any article of waste must be dumped in a designated facility, the designated facility being the Solid Waste Authorities. That included in the testimony is relevant to this and we cite that. That includes, for example, if you went through a McDonald's drive-thru, ate your hamburger, and had the wrapper. Under this ordinance, it is illegal to drive back to your home in North Carolina or anywhere else if you were on vacation with that article of trash. There's nothing like that discussed. That is a very heavy burden. There's nothing like that discussed in either Carbone or in United Haulers. Is that in the ordinance itself or is that the Solid Waste Authority's interpretation of the ordinance? Both, Your Honor. And if you could point me to that in the ordinance, that would be great. Yes, ma'am. And why don't you do it when you come back up? I don't want to take I'm sorry. Thank you. I meant to bring this up with me. In 2.1.1, it states that the dumping or depositing by any person at any place other than at the designated facilities of any acceptable waste generated within the county is prohibited. That was also, as the court noticed, that was And Mr. Knight, in his deposition, he stated that that would be illegal. That would be inappropriate for anyone to take trash outside of the county. You took a McDonald's bag outside the county. I'm sorry, Your Honor. If you take a McDonald's bag outside the county. You would be in violation. Even if you're going to put it in your own trash can? Yes, sir. If you're not going to put it in a landfill? You would have to put it in the landfill, their landfill inside Horry County or you're in violation. You take it and just don't put it in a landfill at all that you simply put it in a trash can. That would be a violation. But theoretically, but isn't there a practical component to this with the with the county give a darn McDonald's bag? I don't think they're out there, you know, she catching people with McDonald's bags. No, but under their their state, if we if we see something like that, we could deal with it at the time. Could we not? But I mean, the chances of them trying to find or what's what's the penalty for violation of the ordinance? Your Honor, there is a penalty. Um, they I can't remember exactly what the amount of the fine was, but there's a penalty in my client, for example, was assessed with penalties, right? But what I'm saying is that's a, um, you know, the your your client owns and operates a private land. Yes, they are. Um, that seems to me just that seems to me the class of persons who would object to this ordinance. Um, your client, I mean, you might try to have a McDonald's. You might try to say you're championing the cause of the McDonald's customer. But I mean, in reality, you're not. You're not a blame you for this, but you're championing your own economic interest is the owner and operator of a private landfill. And if, uh, if the county gets really exercised over somebody taking a McDonald's bag over the county line, we can deal with that when it happens. Yes. But I mean, that doesn't seem really realistic. We're talking about here. Um, McDonald's customer hasn't challenged this ordinance. The people that are going to challenge this ordinance are going to be the people that are disadvantaged by it, which, um, are going to be private landfills outside the boundaries of our accounting. Your Honor, and I have two clients, the private hauler and a private landfill, both of whom are disadvantaged, uh, under this. I didn't understand the private hauler to be disadvantaged because the as I read the ordinance, it applies chiefly to the landfill that a private hauler could still take solid waste as long as it was transported to a public landfill. I don't understand the private hauler. You're not. You're not a private hauler, are you? Yes, sir. Your Honor. One is a private hauler. You still take the Can't you still take solid waste to a public landfill within Horry County? We could. Yes, Your Honor. So how is a private hauler get into this? It's really a distinction between landfill. So the private hauler, Your Honor, tries to make profit on the private haulers. Private haulers profit is based on what they pay at the landfill, and the private hauler is disadvantaged because they can pay a lower price in other landfills that are located outside of Horry County. So but you're not facially that you're not. The terms of the ordinance don't bear down on your the the hauling part of your business. Your Honor's getting at whether or not the haulers were treated differently under the terms of the ordinance itself. It appears the the haulers would be treated the same, although I would assert that they are seem to me because it doesn't seem to me that they're differentiating between private haulers. It seems to me what they were as I read the ordinance. Yes, Your Honor. Seems what they were doing was it was advantaging a public landfill. That is the core of it, Your Honor, for sure. But in its implementation, there is evidence in the record that they allowed some private haulers, not my private hauler, some private haulers to take waste, the same type of waste, across the boundary and dump it in three or four other landfills which we've described in our briefs. That is in violation of the statute, the ordinance, excuse me. And it certainly was treating those private haulers differently. And the court in United Haulers clearly says that when there is a difference in treatment, then you apply, then it is facially considered to be invalid. And then they have to go to those steps, Your Honor. One of your arguments was that a great of differential treatment. Yes, ma'am. And what I was not clear about is whether there was evidence in the record that indicated that that trash was actually covered under the ordinance. Because there is acceptable ways. Yes, Your Honor. Which if you read through the ordinance, it certainly goes out, the definitional section certainly narrows 2.1.1 pretty considerably. Yes, ma'am, Your Honor. So in the Joint Appendix 197, there is a report, the State Solid Waste Report. And it lays out what type of waste was taken outside of Horry County. It was almost 2,000 tons. I think it was around 1,800 tons. And that waste was MSW waste and construction and demolition waste, which is the waste that's covered by the ordinance. And we, Your Honor, looked through the definitions. It is construction and demolition waste. Not parties. No. And that is in Joint Appendix 197. And that is something the trial court erred in. They said there was no evidence of that. But that was on the record. It is included in the appendix. And it's a little bit difficult to read. But it enumerates the amounts on one page that went to these other counties. And then on the next page, it talks about how much had come from Horry County. And that report is MSW and construction and demolition debris waste, which is what's covered. Your Honor, if you say that strict scrutiny shouldn't be applied or that it's not per se. You're talking about the equal protection argument now? Your Honor, I'm still, really, the equal protection and the Commerce Clause arguments really collapse into one if you read the cases. Whether they were treated differently is an equal protection case and also Commerce Clause. But assuming that you applied the pike balancing test, assuming that you said it's not facially invalid, which we disagree with, the court did not balance. Under the pike balancing test, the court should look to see whether the burden imposed is clearly excessive in relation to the local benefits. It's what United Haulers did. And in United Haulers, there were tremendously different factual situations. They had a solid waste crisis. They had organized crime running the dumps. They had incredible environmental problems going on. They had price fixing. They had price gouging. In this case, the only benefit that's been put forth, and there's an incentive. Well, do you need a crisis in order to espouse a benefit? I mean, that the state's purpose was to protect health, safety, and general well-being of the citizens of Horry County. You don't need to wait for a crisis to make that happen. I don't think you need to have a crisis. But in interest that outweigh the substantial impact on interstate commerce. Well, the interest would seem to me to be pretty apparent. Absent an ordinance like this one, trash is going to be disposed of in the most economically advantageous way, which is not necessarily the most environmentally benign way or the most healthful way. And it is an area that courts have traditionally recognized as being particularly appropriately addressed at the local level, isn't it? Your Honor, there is a state solid waste act that requires and manages and regulates how waste is disposed of in South Carolina, which the private landfill has to meet for environmental reasons. Your Honor, there was no evidence put into this record that there was environmental problems with the waste leaving Horry County. And certainly there is case law that says that once an item leaves the county, the jurisdiction, the jurisdiction cannot assert as a reason that there might be some harm that occurs somewhere else. That's talked about in cases as far back as Baldwin many years ago. And it's also discussed in Carbone. Suppose the waste is transported across the Horry County line. Is that a constitutional violation? Because it would still seem to permit any private hauler to do that. That would seem to me to be more of a state law question. And you could, you know, bring an action and say this is a violation of the of the ordinance. But that would be a matter of state law. As long as any private, as long as you weren't discriminating between private carriers in the transportation of waste, I don't understand why it necessarily matters for constitutional purposes, whether it's transported across the county line or not, as long as there's, not discrimination in some fashion between different private groups. Your Honor, two responses to that. One, there is evidence in the record there was discrimination. But second, I'm not sure what that is. You're saying there's a genuine issue of fact on everything. And I don't, you know, and I don't, I'm just not sure you, if the word genuine has actually been met. Well, there was almost 2,000 tons of applicable waste, covered waste that was taken outside of the county by some private haulers. In terms of the Constitution, why isn't that simply an up and down state law violation of the terms of the ordinance itself? As long as, you know, as long as I don't understand why that factor in and of itself is a Commerce Clause violation. Because, Your Honor, they have restricted the waste into their political boundaries. It can't go to North Carolina, it can't go anywhere else in South Carolina. And so what the court said in United Haulers was, there are certain circumstances they can do that if they meet the pike balancing test. And they cannot, they have to treat every private entity the same. And that goes back to the chart at 197. Yes, ma'am. And is there, there's certainly the evidence that you point to that at least in um, some circumstances that occurred, is there any evidence to indicate that Horry County was aware that it was occurring? Your Honor, there certainly is evidence in the record in the testimony of Mr. Foxworthy, I believe, that they knew that it was going south to Georgetown, the Georgetown dump. Now, the Georgetown dump is... That's also a publicly owned dump. It is a publicly owned... So that doesn't really... Well... That's, that can't factor into our analysis. Your Honor, I believe it can, because they still have to have a rational reason to make the distinction. Well, they have a, their rational reason is that they have every reason to believe that another county is going to have the same interests in its environment and the health of its citizens as it does. And the private facility is regulated by the same regulations that apply to those public facilities in South Carolina. Well, you don't have, you don't have, the discrimination I think that you have to public-private discrimination, not public-public discrimination to the extent that there is such a thing. I understand. And the court, this document, you asked if Horry County would be aware, this document is a public document. This document is compiled through the records of Horry County and through these other units of these other dumps. They had to have... With respect to the Georgetown facility, I understood your objection to be that it wasn't actually designated. And again, maybe it's designated, maybe it's not. But I don't, as long as it, and I agree with my colleague here, as long as it's a public facility, what, what difference does it make for constitutional law purposes whether it's a designated facility or not? I mean, we seem to be wandering from the constitutional inquiry to a lot of state law questions. Your Honor, I think that the constitutional inquiry is on the hauling company. Why did some private hauling companies, and this addresses the question of Judge Duncan, is why did some private hauling companies, why were they allowed to take waste outside of the county when our private hauling company never was? Well, I think one response to that, and that was what my earlier question was going to, is that they weren't allowed. I mean, they did it, but they did not do it with the imprimatur of SWA. Well, it was reported, it's known, and they haven't, there's no evidence they've been fined or there's been any steps taken against them. And again, the courts, both, in both cases, the courts are clear, you have to apply at least the pike balancing test, which the... So that just gets us into all kinds of super legislative determinations. We're taking the pike balancing off benefits and burden. There are a number of members of the court that have a great deal of reservation about all this pike balancing, because it's so subjective, and there's a problem here with just cutting into the core of the state police power, and here they have perfectly decent environmental reasons and revenue generation reasons over landfill, over solid waste, which they own. And we're going to try in the face of Davis and United Haulers to cripple that, and that just begins to unwind those decisions and to really interfere with the ability of hard to impact the environment in those areas, and to have some relief in terms of their local budgets. We're going to suck that right in the gut if we take your position. You can respond on rebuttal, okay? Thank you, Honor. All right. Battle. Good morning, police and court. My name is Mike Battle. I'm here on behalf of Horry County Solid Waste and Horry County. Seated at the council table with me is Scott DeBoff. He's a partner with the law firm of, I have to get this out, Garvey, Schubert, and Bair. And without, and also have Danny Knight and Mike Bessett from the Horry County Solid Waste Authority here with me. Without becoming too obsequious, you've already made my arguments pretty much for me and done an excellent job. Well, I have a question about, before you become too complacent. I'm not complacent. The JA-197 exhibit and what it tells us about the allowing of other unacceptable waste to leave Horry County. All right. That was dealt with in page 29 of our brief. And you had the affidavit Danny Knight talks about. We were not aware of any acceptable solid waste leaving Horry County with the exception of the Georgetown in the neighboring county. And that was based on an existing agreement that went back as far as 293. I understood that, but does this include, might this include the Georgia, the waste that left pursuant to that municipal compact that you had with Georgia County? Georgetown. What I'm trying to do is close the loop on that approximately 2,000 tons of waste that a public document reflected was leaving the county. I believe that if you look in the definitions in the DHEC reports, there are areas and waste that does not come within our acceptable waste definition. One of them would be land clearing debris. Yeah, I saw that. But specifically with respect to this chart. All right. And what, help me. How is that accounted for? Is that, might that include waste that went to Georgetown? It is broken down by landfill and it allocates each amount of tonnage to each landfill. There are some tonnages that went to Richland County. There are some tonnages that went to Berkeley County. I'm not aware of any tonnages that went to private landfills. This is a, this is, these landfills are all spelled out in the particular. Because it's in the, right, it's in the, sorry, right. So that's your response to the argument that there is considerable or some tonnage leaving the county? Well. Impermissible. As a, as an analytical tool, do you want to use a dormant commerce clause to enforce state law, as Judge Wilkinson said? Basically, our, our executive director said we're not aware of any acceptable waste that went to a private, private landfill. And the, the whole idea is what is, what is, who is the best person to solve the problem of solid waste? Is it the courts? Do the courts need to be looking after people with McDonald's bags? Or, or is that something that's a state issue? And do you have a, what would be your response to your colleague's assertion with respect to the breadth of 2.1.1 in comparison to the ordinance in United Haulers? That, first of all, I think that acceptable waste is defined, as you pointed out, in 1.21. That would, is, is narrower and hits the area that it's, acceptable waste means ordinary household, municipal, institutional, commercial, and industrial solid waste. And then it talks about solid waste in construction and demolition waste. That would not include the types of waste or the types of points that my colleague has made in his brief. Recycling does not go in there. Lumber, he wouldn't go in there. You know, the, the changing to, you know, the, the, the paper in his thing. Really, the idea is once it becomes abandoned by the person in one of these ways, becomes acceptable waste, should be taken to our landfill. But isn't it, you know, again, so many, a good number of the questions about how much waste left the county and whether it's acceptable or not and everything. They, they seem to go to a question of whether there was a violation of the terms of the state ordinance itself. That's a state law question. The constitutional question under United Haulers is whether you discriminated among state and among different private landfills. Right. That's the constitutional question. Whether you, whether you discriminated, not whether you had, whether all of these terms of the state ordinance, whether there was this infraction or that infraction. Because that can be dealt with in a, in a different suit by somebody, you know, on, over state law question. But the question before us is, did you discriminate between private landfills or did you seek simply to benefit a public landfill? And even the Georgetown facility, I thought that the reservation expressed about that it was somehow not designated. But I'm not sure what the constitutional significance of that is because, as I understand it, the Georgetown landfill was not only the subject of an intergovernmental agreement, but was also a public landfill, which doesn't seem to me to get to what we're primarily concerned about with the Dormant Commerce Clause inquiry, which is discrimination between different classes of private landfills. Now, you know, I have some sympathy because the plaintiff here has lost a good deal of business, but that is, that's a risk of doing business is that sometimes public laws are going to be passed that cause some private entity to lose business. But that doesn't create a dormant, that in and of itself, the fact that a public law causes a private entity to lose revenue doesn't create a constitutional question. The, the localities across this country need revenue badly. One of the ways they could do it is by directing the disposal of solid waste within the county if it's generated within the county, they own it. They own it. They ought to be given some latitude in how it's disposed of. And if you take this whole thing and you put it into the private sector, it's quite possible that this is going to be a lowest bidder thing and that the low bids are going to be those that cut environmental corners. And the county may want to head off that possibility, too, and I'm afraid that the plaintiffs want to erect big hurdles to the kind of ordinances, which it did seem to me, that United Haulers wanted to say was permissible. And there's a, that's a very troubling road to go down. I agree 100 percent. Yes. I, I would, I would, I would also just as. Let me ask you about, I mean, there was an argument made in the district court that perhaps there was discrimination between private companies because the ordinance requires the sorting of construction demolition waste from recyclables within the county. And in order for an out-of-county hauler to do that, they would have to purchase land and buy a transfer station to do that, whereas in-county haulers would not be required to do that. Isn't that a form of private discrimination that might support the plaintiff's claim in this case? Well, the hauler in this situation was an Ory County. Every private company has to have a land or an area to do the separation. And as the district court pointed out, simply a matter of getting an acre of land. Not expensive, not heavy burden on that. And it deals with what is allowing certain people to do it. We would allow that hauler to do it in Ory County just like we do every other hauler to do it in Ory County. The fact that he's chosen to locate his landfill outside of Ory County is not something that we should be concerned with because this is an enforcement mechanism. Once they take it out of Ory County, we have no control, as he very well said, and then there's no reason for them to bring it back once it's recycled. And so for that reason, I don't think there's discrimination against private haulers. All private haulers have the same requirement. And that requirement is to separate the waste in Ory County. All right. Fair enough. We would, if we did differently, we would be discriminating against them and saying, well, you've got to, you can just do it anywhere and then you can take it out. And that would also deal, dealing with the other points that were made. Did I answer your question? The point of selective enforcement has been dealt with in Oyers versus Boyles, a U.S. Supreme Court case, and they say selective enforcement does not arise to constitutional problems. That's, as you say, a state problem. And there may be some selective enforcement. That's the best he's got. He has no proof. Doesn't even have, you know, you've got this report. He doesn't even have a witness from DHEC named in his interrogatory answers or in his, any of these landfills to say that this was land or any evidence that there was, that we knew about this. So for that reason, this thing has been through extensive discovery. Scheduling order has been extended four times. There is no evidence of any conspiracy or disparate treatment of any private entities. And then the third thing, and then I'll go ahead and sit down, but I think the point that you're making was made very well by Justice Roberts when he says, the contrary approach of treating public and private entities the same under the Dormant Commerce Clause would lead to unprecedented and unbounded interference by the courts with state and local government. The Dormant Commerce Clause is not a roving license for federal courts to decide what activities are appropriate for state and local governments to undertake and what activities must be the province of the private market competition. And I think that is the point we're trying to say. Legislatures, you've given us the federal government under the Resource Recovery and Conservation Act has given us a task to take care of an environmental problem. South Carolina Solid Waste Policy and Management Act have given us a task. They said this is a task best solved by local governments and by the states and that for that reason, let's let the local community have it and let's let them solve it and let's not try to use the Commerce Clause as a means to interfere with trying to solve this problem that has been delegated by Congress and by the state. Thank you. Thank you. All right. Are there any other questions? Yes, sir. I think I should step back to answer Judge Wilkins' question that we ended on. And that is that the first step in analyzing the Dormant Commerce Clause is, is there restrictions between the flow of goods across political boundaries? We know from a long line of cases, you cannot restrict goods from coming into your state, including waste. And the same is true, you can't restrict goods from leaving your state, including waste. What's different is when the state is a market participant. That's what United Haulers discusses and Department of Revenue v. Davis later discusses. And when they are a participant, such as, so clearly this would not be allowed if they were restricting it and the only people involved were private entities. When the state or a local government is a market participant, as they are here, then you have to look at the burdens, clear burdens placed on interstate commerce and see whether they're outweighed by the factors that are set forth. And that's why we get to the pike balancing test. And that's what is set forth in United Haulers that you're supposed to do. You apply the strict scrutiny if on its face it's discriminatory or in its application it's discriminatory. Let's come back. I can understand the effects test and everything, but too much pike balancing just makes me nervous because pike balancing is weighing cost and benefits of legislation. And that, in this passage that he read from Chief Justice Roberts, is emblematic of what the court is saying. And that is that absent some discrimination among private entities, particularly in-state versus out-of-state private entities, that we don't have a license to just say, well, here are the benefits of this ordinance and here are the costs of the ordinance and everything. I mean, we're not, it just makes us into a solid waste authority. And, you know, I don't, I frankly don't have the background for it. I understand the court doesn't like the pike balancing test. I understand that and it's hesitant. But it's there and that's what we're instructed to use. And it certainly must mean something. It's not, right at this point in time, it's not what I would call a favored tool. I hear you. Yes, Your Honor. Going back, we do have to apply first. Is it facially discriminatory? It builds a wall around Horry County, indisputably. The weight, the good cannot flow out of Horry County. It restricts the trade. It restricts it from going to North Carolina. Whether it's a McDonald's bag, and I understand that that is not what's before you, but it is that broad. Or whether it's our hauler trying to take it to North Carolina or to his land, the sister landfill, or to one of these other landfills. It builds a wall around Horry County. But they own this stuff. Well, Your Honor, the individuals own the stuff. The people who generate the waste own it. Well, you don't own it. Horry County owns it. If I am in my house, and I eat a McDonald's bag, and I throw it in the trash can, I own it. You've abandoned it. When I take it, when I take it to their facility, I abandon it. When it's in my trash— Even though you've tossed it in the trash can, you've got, you could walk to the landfill tomorrow and— If somebody was, if somebody was digging through my trash can, they would be looking in my property or whoever else's property. And they are restricting our ability, my client's ability, or that individual's ability, to move that across state lines. Thank you very much, Your Honor. Thank you, sir. We'll come down and—
judges: J. Harvie Wilkinson III, Allyson K. Duncan, Albert Diaz